IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

PRODUCT SOURCE          )
INTERNATIONAL, LLC,     )
    Plaintiff, Counter Defendant,     )
                                   )          Case No. 1:14-cv-816
          v.          )
                                     )
LEONID NAHSHIN,          )
    Defendant, Counter Claimant.     )
                                     )

## MEMORANDUM OPINION

This 15 U.S.C. § 1071(b) trademark dispute grows out of a decision of the Trademark Trial and Appeal Board ("TTAB") to cancel plaintiff Product Source International, LLC's ("PSI") registration of the trademark "NIC OUT" for mechanical cigarette filters designed to remove nicotine from cigarettes. In February 2010, defendant Leonid Nahshin ("Nahshin"), who contends that he is the actual owner of the NIC OUT mark, filed a petition with the TTAB seeking cancellation of PSI's registration of the NIC OUT mark. This petition succeeded, and on June 21, 2013, the TTAB issued a decision cancelling PSI's registration of the NIC OUT mark. In this § 1071(b) action, PSI contends that the TTAB incorrectly concluded that Nahshin, rather than PSI, owns the NIC OUT mark and requests that PSI's registration of the mark be reinstated pursuant to 15 U.S.C. § 1119, which provides that "[i]n any action involving a registered mark the court may . . . restore canceled registrations." In response, Nahshin alleges three counterclaims:

    (1)    First, Nahshin asserts a claim for trademark infringement on the ground that PSI's use of the "NIC OUT" mark constitutes a "false designation of origin, false or misleading description of fact, or false or misleading representation of fact" that is likely to cause confusion or

1

mistake as to the origin of the goods, in violation of 15 U.S.C. § 1125 (Count I);

(2)   Second, Nahshin claims that PSI's NIC OUT registration should be cancelled because it is likely to cause consumer confusion (Count II); and

(3)   Third, Nahshin claims that PSI's NIC OUT registration should be cancelled because PSI was not the owner of the mark at the time it applied for the registration (Count III).

The parties have filed cross-motions for summary judgment on PSI's claim for reinstatement of the mark and Nahshin's three counterclaims. The claim and counterclaims raise the following common questions of law and fact:

(1)   Whether the undisputed record evidence establishes that Nahshin was the owner of the NIC OUT mark prior to PSI's trademark application;

(2)   If the record establishes that Nahshin owned the mark, whether Nahshin is nevertheless barred from asserting a cancellation action on the ground that he acquiesced in PSI's ownership of the mark;

(3)   If the record establishes that Nahshin owned the mark, whether Nahshin is nonetheless barred from bringing an infringement action against PSI as a result of Nahshin's acquiescence in PSI's use of the mark or as a result of the equitable doctrine of laches; and

(4)   Finally, if the record establishes that Nahshin was *not* the owner of the NIC OUT mark at the time PSI applied for registration of the mark, whether *PSI* is the owner and thus entitled to reinstatement of its registration of the mark.

For the reasons that follow, the parties' motions must be granted in part and denied in part. First, the undisputed summary judgment record clearly shows that Nahshin, not PSI, owned the NIC OUT mark at the time PSI applied for registration of the mark, and thus PSI's claim for reinstatement must fail. Second, although PSI may not rely on the affirmative defenses of laches or acquiescence to divest Nahshin of his trademark or to prevent the issuance of prospective,

2

equitable relief to enjoin PSI's continuing infringement, Nahshin's implied consent to PSI's infringing use of the NIC OUT mark bars him from now recovering monetary damages for PSI's past infringement.

## I.

An applicant who is "dissatisfied with the final decision" of the TTAB has a choice of remedies: (i) the applicant may appeal that decision to the U.S. Court of Appeals for the Federal Circuit pursuant to 15 U.S.C. § 1071(a), or (ii) the applicant may have a "remedy by civil action" in district court pursuant to 15 U.S.C. § 1071(b). In a case pursuant to § 1071(b), a federal district court has authority "independent of the [U.S. Patent and Trademark Office ("PTO")] to grant or cancel registrations and to decide related matters such as infringement and unfair competition claims." *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 155 (4th Cir. 2014). Such a case may be decided on the administrative record from the TTAB, admitted by motion of the parties, and this record "shall have the same effect as if originally taken and produced in the suit." 15 U.S.C. § 10. But importantly, the parties to a § 1071(b) action retain "an unrestricted right to submit further evidence" in addition to the TTAB record. *Id.* When such new evidence is submitted, the district court must consider the entire factual record *de novo* and is not limited to the usual deference to the agency's factual findings. This is so because "the district court cannot meaningfully defer to the PTO's factual findings if the PTO considered a different set of facts." *Kappos v. Hyatt*, 132 S. Ct. 1690, 1700 (2012); *Swatch AG*, 739 F.3d at 156. Nevertheless, a district court in a § 1071(b) action may give newly submitted evidence less weight if "the facts of a particular case cast suspicion on the new evidence that an applicant failed to introduce before the TTAB." *Swatch AG*, 739 F.3d at 156 n.6 (internal quotation omitted).

The TTAB administrative record has been made part of the summary judgment record as the parties have moved for its admission, and PSI has also introduced additional evidence. Accordingly, this additional evidence and the TTAB record are reviewed here *de novo*. With this standard of review in mind, the record facts of the case can be succinctly stated as follows:

### a. Leonid Nahshin and P. Service

Leonid Nahshin is a citizen of Israel and the sole proprietor of an Israeli business, P. Service. Nahshin Depo. at 16–17.[1] He began selling a cigarette filter under the brand name "NIC OUT" in Israel in 2000. Nahshin Depo. at 26–27, 29. In preparation for going into the cigarette filter business, Nahshin contends that he developed the brand name "NIC OUT" in 1999 with the help of his English-speaking wife. *Id.* at 30–31. He contends that he chose to develop an English name because many people trade commodities in English and he wanted his product to have international reach. *Id.* at 30.[2]

---

[1] In its briefing, PSI makes much of the distinction between Nahshin and P. Service, essentially arguing that any activities relating to the trademark NIC OUT were undertaken by P. Service, not Nahshin. Yet, in the United States, there is generally no legal distinction between a sole proprietorship and the sole proprietor himself. *See, e.g., Jeroski v. Federal Mine Safety & Health Review Comm'n*, 697 F.3d 651, 652 (7th Cir. 2012) ("A 'proprietorship' is not a legal entity, but merely a name under which the owner, who is the real party in interest, does business."). PSI provides no reason for applying a different understanding in this case.

[2] PSI disputes that Nahshin invented the mark, arguing that on July 13, 1998, Henry Hsu filed a trademark application with the PTO for "NICOUT" for use in connection with a device designed to aerate filters and cigarettes to reduce the smoke inhaled by the user. Pltf.'s Opp. ¶ 5; *see* Trademark Registration No. 2,337,463 (describing a mark used for a "Smoker's Apparatus for Puncturing Holes in Cigarettes"). This device is not alleged to be the same as or similar to the cigarette filter Nahshin eventually marketed as the NIC OUT filter. Moreover, the PTO's trademark database shows that the Hsu "NICOUT" registration was canceled on January 6, 2007. *See* Trademark Electronic Search System, http://tmsearch.uspto.gov/bin/gate.exe?f=searchss&state=4801:ql88da.1.1, search "NICOUT" (last visited June 9, 2015). Nevertheless, PSI's reference to the Hsu trademark application does not create a disputed issue of material fact on this point because the fact that a person developed a slightly different mark for a somewhat different product does not negate or controvert Nahshin's assertion that he was the first to develop and apply the brand name NIC OUT to his

On August 18, 2000, Nahshin signed a contract with a Turkish manufacturer, Burda Ticaret, for the first shipment of his filters. Nahshin Depo. at 44.[3] In preparation for this first order, Nahshin worked with Burda Ticaret to select a packaging design for the cigarette filters. *Id.* at 33–34. The packaging Nahshin selected resembles a box of cigarettes and bears the name "Nic-Out" underneath a solid blue inverted triangle.[4]

Shortly after his first order, Nahshin was introduced to Nicholas Maslov ("Maslov"). Nahshin Depo. at 52. It is undisputed that around March 2002, Nahshin and Maslov entered into an oral agreement whereby Nahshin's company, P. Service, sold NIC OUT filters to Maslov's company, Safety Aid Supplies ("SAS"), and SAS, in turn, sold those NIC OUT filters to customers in the United States. Nahshin Depo. at 56–57.[5] It is also undisputed that in September 2002, P. Service began shipping NIC OUT branded filters to SAS for sale in the United States. Nahshin Depo. at 61–62, Ex. 5. Additionally, the record reflects that Nahshin himself made

---

cigarette filters. In any event, whether Nahshin was the very first to invent the term NIC OUT in this context is not material to the trademark ownership dispute here. Even assuming *arguendo* that Hsu first registered the mark, this does not negate the fact that Nahshin was the first to use the mark NIC OUT in sales of his mechanical cigarette filters in the United States.

[3] Nahshin later worked with a different Turkish manufacturer, Atash. Nahshin Depo. at 26–27, 29.

[4] PSI points out that Burda Ticaret was already manufacturing a cigarette filter with an essentially similar packaging design with the exception that Burda Ticaret used a red instead of a blue inverted triangle. *See* Nahshin Depo. Ex. C. In any event, it is undisputed that Nahshin requested that the color be changed from red to blue and instructed the manufacturer as to the name and other text to be placed on the package. Nor is it disputed that Nahshin supplied the name "Nic-Out" for the filters. Regardless, the fact that Burda Ticaret manufactured a cigarette filter with essentially the same packaging design does not negate or controvert the fact that the record shows that Nahshin used the mark in commerce before PSI's registration.

[5] At this time Nahshin also signed a written "Agreement on Joint Activities" with a company called New Shore Corporation. Nahshin Depo. Ex. 6. Maslov, of SAS, was identified as the representative of New Shore Corporation. *Id.* Yet, the record shows that Nahshin never sold any product to New Shore Corporation and Nahshin testified that he simply complied with Maslov's request that Nahshin ship the product to SAS instead. Nahshin Depo. at 58.

5

sporadic sales directly to other customers in the United States, beginning with two sales in 2003 to customers in California and Detroit. Nahshin Depo. at 61–62; *id.*, Ex. 16.[6] The record reflects that after 2003, Nahshin's individual sales increased. P. Service's records show that in each year from 2004 to 2014, Nahshin made sales to between 36 and 343 buyers within the United States. *Id.* The record also shows that Nahshin advertised and made available his NIC OUT filters to customers in the United States through his website, "www.nic-out.com," since 2005. Nahshin Depo. at 85, 118–20; Decl. of Alex Slobdiker at 6.

### b. Product Source International

PSI is a New Jersey limited liability company formed in 1998 and owned by Eugene J. Higgins ("Higgins"). Higgins Decl. ¶ 1. In 2003, Higgins met Maslov at a New York City trade show where Maslov was promoting Nahshin's cigarette filter under the brand name NIC OUT. *Id.* ¶ 2, 3. By this time, at Maslov's request and with Nahshin's agreement, the NIC OUT packaging had been changed to remove "Product of P.Service Israel" from the box and to state instead, "IMPORTER: Safety Aid Supplies, Inc New York USA www.nicout.com." Pltf.'s Ex. B. Thus, when Higgins encountered the product at the trade show, the boxes reflected the SAS corporate name as the importer. Higgins Decl. ¶ 8.

---

[6] PSI disputes these 2003 sales as unverified on the ground that PSI's attempts to serve subpoenas on these customers were unsuccessful because the addresses obtained from P. Service's records were invalid. This does not create a material issue for two reasons: First, the addresses came from sales records more than ten years old and it is therefore unsurprising that the addresses are no longer valid. Second, and more importantly, these two sales were not the only sales made by Nahshin to customers in the United States before PSI applied to register the NIC OUT mark. Most notably, Nahshin was selling his filter under the mark NIC OUT to SAS and SAS was in turn selling those filters to PSI for at least three years before PSI's trademark application. With respect to the California and Detroit sales, PSI also argues that they should be disregarded because these sales were by P. Service, not Nahshin. This argument fails as it ignores that a sole proprietorship is indistinguishable from the individual sole proprietor. *See supra* note 1.

As a result of this meeting at the trade show, Maslov and Higgins entered into an agreement whereby SAS would provide PSI with NIC OUT filters that SAS purchased from Nahshin and PSI, in turn, would market and sell the NIC OUT marked filters in the United States. *Id.* This agreement was embodied in a September 19, 2003 "Product Representation Agreement" signed by Higgins, on behalf of PSI, and by Maslov, on behalf of SAS. Pltf.'s Ex. D. PSI purchased its first batch of NIC OUT filters from SAS on July 10, 2003 and began selling them in the United States in November of 2003. Higgins Decl. ¶ 2; Pltf.'s Ex. A (Purchase Order). At this time, SAS, of course, was purchasing the NIC OUT filters from Nahshin and P. Service. Higgins Decl. ¶ 7.

The relationship between PSI and SAS continued from 2003 to 2007 and was memorialized in a series of written agreements. Higgins Decl. ¶ 12. The third of these agreements included language stating that SAS granted PSI "an exclusive royalty free trademark license to use the Nic Out trademark." Pltf.'s Ex. D (Agreement dated January 10, 2006). During the course of this business relationship, Maslov and Higgins discussed registering the NIC OUT trademark. Higgins Decl. ¶ 13. Accordingly, on March 21, 2006, PSI filed an "intent to use" application with the U.S. Trademark Office. An "intent to use" application is one in which an applicant "who has a bona fide intention . . . to use a trademark in commerce may request registration of its trademark." 15 U.S.C. § 1051(b)(1). The applicant must verify that he or she is "entitled to use the mark in commerce," has an intention to do so, and that "no other person has the right to use such mark in commerce." § 1051(b)(3)(A)–(D). On December 4, 2007, the Trademark Office granted PSI a registration for the NIC OUT mark. *See* Trademark Registration No. 3,350,041.

In the second quarter of 2007, Higgins and Maslov agreed that their companies would part ways by PSI ceasing to buy NIC OUT filters from SAS. Higgins Decl. ¶ 15. At this time, PSI claims that Higgins and Maslov orally agreed that PSI would, as Higgins contends, "keep" the trademark for NIC OUT. *Id.*[7] Yet, the final written agreement between the parties simply states that SAS would transfer the URL "www.nicout.com" to PSI in exchange for receiving one dollar for every "buy two get the third free" sale originating from www.nicout.com and an additional $0.25 royalty for every NIC OUT package sold. Pltf.'s Ex. D (Agreement dated Nov. 1, 2007). The agreement further stated that "SAS will sell Nic Out in retail only to existing distributors and retailers" listed in an addendum and that this list could be expanded at a later date upon mutual agreement. *Id.*

After PSI ceased buying filters from SAS, PSI sought other sources of the NIC OUT filter. Higgins Decl. ¶ 20. Higgins contends that he had seen the name "P. Service" on some NIC OUT containers obtained through SAS, and so Higgins reached out to P. Service to buy Nahshin's NIC OUT filters for resale in the United States. *Id.* The record reflects that from May 2007 to November 2007, PSI purchased Nahshin's NIC OUT marked filters from P. Service. Higgins Decl. ¶ 22. When PSI began purchasing the NIC OUT product directly from P. Service, PSI instructed P. Service to remove the SAS company name, phone number, and URL from the NIC OUT package and to replace it with PSI's name, website, and the trademark application number—which, at the time, was incorrectly referred to as a registration number—corresponding

---

[7] Even assuming that Higgins correctly recalls an oral agreement that PSI would keep the NIC OUT mark, this does not create a genuine issue of material fact as to who owned the mark at the time PSI applied to register it because the facts establish that Maslov did not have any rights to convey to PSI. The trademark rights Maslov allegedly conveyed to PSI in this agreement actually resided with Nahshin, not Maslov.

8

to PSI's 2006 application to register "NIC OUT." Higgins Decl. ¶ 24.[8] Nahshin accepted and made these packaging changes. *See* Pltf.'s Ex. G (email containing mockup of new package design).

Around the time this request was made, Nahshin evidently drafted an email that an employee of P. Service, Alexander Slobdiker, was to send to Higgins. That email was never sent, but stated the following:

> We have known for over 2.5 years of your work on our filters. That is why we are so interested in working together. We even did not contest the priority to the trade mark "Nic-Out" even though we have grounds.

Pltf.'s Ex. E, (May 23, 2007 draft of email sent by Nahshin to Slobdiker). Furthermore, on May 19, 2008, Slobdiker sent Higgins an email informing Higgins that Maslov was now selling NIC OUT internationally without authorization. In response, Higgins wrote: "My company is the SOLE OWNER of the Nic Out Trademark [in the United States]." Pltf.'s Ex. H (May 19, 2008, email from Gene Higgins to "info@nic-out.com"). Slobdiker responded on May 20, 2008:

> Hello Gene,
> I am glad to realize that finally there is a company, which is able to take care of Nic-Out product in whole USA territory.
> Please inform me about all your steps related to our common business.
> Wish you good luck!
> Regards,
> Alex

*Id.* (May 20, 2008, email from "info@nic-out.com" to Gene Higgins). Furthermore, in the course of PSI's and Nahshin's business relationship, Nahshin would direct U.S. wholesale customers that contacted P. Service to PSI, which Nahshin identified as "our American distributor." Pltf.'s Ex. H. (Feb. 13, 2008 email from "info@nic-out.com" to Greg Dupuis). PSI also notes that

---

[8] PSI also requested that P. Service place PSI's Patent Pending number (11/895005) on the box. Pltf.'s Ex. G.

Slobdiker, the P. Service employee, wrote in an email to Higgins that "we have no idea what happens on the American market." Pltf.'s Ex. H (May 19, 2008 email from "info@nic-out.com" to Gene Higgins). The parties do not dispute that Nahshin knew as early as 2004 that PSI was selling Nahshin's/P. Service's NIC OUT filters through SAS. The parties also do not dispute that Nahshin knew as early as May 2007 that PSI had applied to register the trademark NIC OUT.

PSI continues today to promote and advertise NIC OUT marked filters through trade shows, television, internet, and print marketing. Higgins Decl. ¶ 29. The parties agree that Nahshin and P. Service did not personally invest in any advertising within the United States besides the creation of the www.nic-out.com website. Nahshin Depo. at 88–91. Besides selling large quantities of his NIC OUT marked filters to SAS and then directly to PSI, Nahshin also has sold NIC OUT to customers in the United States through this website. A compilation by PSI of receipts from www.nic-out.com internet sales shows close to 100 small dollar transactions from 2002 to 2006 with parties in dozens of states. Pltf.'s Ex. N. In addition, as already noted, Nahshin offers P. Service records showing between 36 and 343 individual transactions with customers in the United States each year between 2005 and 2014. Decl. of Danielle Hart, Ex. A.

### c. Proceedings before the TTAB

In 2008, PSI began purchasing cigarette filters from a different source while still selling these filters using the NIC OUT brand name. Nahshin became aware of this by the "middle of 2008." Nahshin Depo. at 139–40. Then, on June 23, 2009, after receiving letters from PSI demanding that P. Service cease and desist allegedly infringing use of the NIC OUT mark, Nahshin petitioned the TTAB to cancel PSI's NIC OUT registration. Petition for Cancellation, Administrative Record at 73. The TTAB granted Nahshin's petition to cancel on the ground that PSI was not the owner of the mark "NIC OUT." *Nahshin v. Product Source International, LLC,*

Cancellation No. 92052240, 2013 WL 6040375 (T.T.A.B. June 21, 2013). In the course of its

review, the TTAB found the following relevant facts:

> (1) Nahshin selected Nikolai (Nicolas) Maslov to distribute Nahshin's NIC OUT filters in the United States, which Maslov did from 2002 through 2008.

> (2) PSI obtained NIC OUT filters from Maslov and began marketing them during the first quarter of 2003.

> (3) PSI filed its application to register the mark NIC OUT for mechanical cigarette filters for removing nicotine on March 21, 2006.

> (4) There is no evidence that Nahshin authorized the filing of this trademark application.

> (5) There is no evidence that there was any transfer of rights to the mark NIC OUT from Nahshin to PSI.

*See id.* at *4–5. Although the TTAB panel expressed some skepticism with respect to PSI's

contention that SAS had orally agreed to transfer the trademark to PSI, the panel reasoned that

even if this agreement had occurred, PSI could not have acquired any rights to the trademark

from SAS because SAS did not *have* any rights to convey. Further, the TTAB rejected the

contention that PSI could have acquired ownership of the mark when it began purchasing the

product directly from Nahshin/P. Service for further resale to U.S. customers. In this regard, the

TTAB noted that "[g]enerally, the mere fact that a U.S. distributor distributes a foreign

manufacturer's branded product does not, without more, give the U.S. distributor an ownership

interest in the mark." *Id.* at *7. Accordingly, the TTAB concluded that Nahshin became the

owner of trademark rights in the mark NIC OUT in the United States through the distribution of

NIC OUT filters in the United States by Maslov and thus that PSI could not have been the owner

of the mark at the time it applied for registration. *Id.* at *5. The TTAB therefore cancelled PSI's

registration.

## II.

Summary judgment shall be granted in favor of a movant "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All inferences from the undisputed facts must be drawn in the non-moving party's favor. *Id.* at 330 n.2. Here, the parties have cross-moved for summary judgment on all claims and counterclaims.

It is appropriate to begin the summary judgment analysis with the central question whether Nahshin was the owner of the mark "NIC OUT" prior to PSI's March 26, 2006 application for registration. The Lanham Act provides that a trademark registration may be cancelled "[i]f it is found after a hearing before the Board that the registrant is not entitled to registration." 15 U.S.C. § 1092. A mark which "so resembles . . . a mark or trade name previously used in the United States by another" is not entitled to registration. *Id.* § 1052. Thus, if Nahshin was the common law owner of the NIC OUT mark at the time PSI applied to register the mark, then the existence of a prior user and owner of the mark barred PSI from registering the NIC OUT mark.[9] And, if PSI was not entitled to register the mark, then PSI's claim for reinstatement must fail and the TTAB's cancellation of PSI's registration must stand.

---

[9] PSI contends that it was not required to "own" the mark at the time of registration. To be sure, it is true that an applicant with an intention to use a trademark may be entitled to register the mark even though the applicant may not have yet used that trademark in commerce so as to "own" that mark under the common law. But this misses the point; PSI was not entitled to register the mark if the mark was owned by *someone else*. *See* 15 U.S.C. § 1051(b)(3)(D) (requiring that an applicant with a "bona fide intention to use" a trademark must verify that "no

In the absence of a valid trademark registration, it is the common law that determines trademark rights. Common law trademark ownership "is acquired by actual use of the mark in a given market." *Emergency One, Inc. v. Am. Fire Eagle Engine Co., Inc.*, 332 F.3d 264, 267 (4th Cir. 2003) (internal citations omitted). When there are competing claims to a mark, "priority is determined by 'the first actual use of [the] mark in a genuine commercial transaction.'" *Id.* (quoting *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 358 (6th Cir. 1998)). The use of the mark must be "bona fide use . . . in the ordinary course of trade, and not made merely to reserve a right in the mark." *Emergency One, Inc. v. Am. Fireeagle, Ltd.*, 228 F.3d 531, 536 (4th Cir. 2000). In other words, the mark must be affixed to or associated with the product in commerce, as opposed to mere promotional use[10] or licensing the mark for non-commercial purposes.[11] *See* 15 U.S.C. § 1127 (a good is deemed to be used in commerce when "it is placed in any manner on the goods or their containers or the displays associated therewith" and "the goods are sold or transported in commerce"). Furthermore, for sales of a product to constitute use in a given market, the sales must be deliberate and continuous, rather than sporadic, casual, or transitory. *Larsen v. Terk Techs. Corp.*, 151 F.3d 140, 146 (4th Cir. 1998) (citing *La Societe Anonym des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271–72

---

other person has the right to use such mark in commerce either in the identical form thereof or in such near resemblance thereto").

[10] *Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1582–83 (Fed. Cir. 1990) (finding that promotional use of a mark on "incidental products" like whiskey, pens, watches, sunglasses, and food did not constitute use of mark for cigarettes).

[11] *Silverman v. CBS, Inc.*, 870 F.2d 40, 47–48 (2d Cir. 1988) (finding that licensing trademark for use in connection with documentary and educational programs did not constitute "use" sufficient to avoid the conclusion that the mark had been abandoned).

(2d Cir. 1974)).[12] Finally, ownership of a mark extends only to those markets in which the trademark has been used "or its meaning has become known." *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 415–16 (1916). In sum, Nahshin can establish common law ownership of the NIC OUT mark if established that he continuously and deliberately used the mark in commerce in the United States prior to PSI's application to register the NIC OUT mark.

The undisputed record facts demonstrate that Nahshin established common law ownership of the NIC OUT mark prior to PSI's application for registration by using the mark in the U.S. market through the substantial sales of NIC OUT filters to SAS. There is no dispute that filters bearing the mark NIC OUT first arrived in the United States when Nahshin's company, P. Service, entered a distribution agreement with SAS in 2002, nor is there any dispute that the NIC OUT branded filters PSI obtained from SAS and sold in the United States were filters from that same supply chain. Moreover, these sales preceded PSI's March 2006 application for registration. Specifically, Nahshin sold NIC OUT filters to SAS in the United States from September of 2002 to early 2007, at which time Nahshin then began selling NIC OUT filters directly to PSI. In other words, Nahshin had been selling his NIC OUT marked filters within the United States for almost four years before PSI applied to register the mark. Furthermore, the conclusion that Nahshin established common law ownership of the NIC OUT mark is not undermined by the fact that Nahshin primarily sold to distributors. The trademark use requirement does not require a manufacturer of trademarked goods to take those goods personally to market. In fact, the weight of authority holds that where a foreign manufacturer engages an exclusive U.S. distributor, the presumption is that, absent evidence to the contrary,

---

[12] *See also Exxon Corp. v. Humble Exploration Co., Inc.*, 695 F.2d 96, 99 (5th Cir. 1983) (holding that limited sales of preexisting "Humble" branded oil with an explanation that these customers were receiving Exxon products were not sufficient to constitute "use" to avoid abandonment).

trademark rights remain with the foreign manufacturer.[13] And here there is no evidence that Nahshin and SAS or Nahshin and PSI had any agreement transferring or ceding Nahshin's rights to the NIC OUT trademark either to SAS or PSI.

Furthermore, although Nahshin's sales to SAS and PSI are, by themselves, sufficient to establish Nahshin's common law ownership of the NIC OUT mark, they are not the sole basis for that ownership. In addition, as the summary judgment record shows, Nahshin made other sales of his filters bearing the NIC OUT mark directly to other customers in the United States. The summary judgment record establishes, for instance, that P. Service made over 200 individual sales of NIC OUT in more than forty states in 2005 and 2006, prior to PSI's application for registration. *See* Decl. of Danielle Hart Ex. A; *see also* Pltf.'s Ex. N. As noted earlier, P. Service also has records of two sales in 2003, prior to PSI entering into its agreement with SAS to sell NIC OUT filters.[14]

Thus, the summary judgment record is clear that Nahshin was the common law owner of the NIC OUT mark prior to PSI's 2006 application for registration. Accordingly, the TTAB's cancellation of PSI's registration of the NIC OUT mark was correct and PSI is not now entitled to reinstatement of its registration.

---

[13] *See, e.g., Roger & Gallet v. Janmarie, Inc.*, 245 F.2d 505, 510 (Fed. Cir. 1957) (holding, in a dispute between a foreign manufacturer and U.S. distributor, that the foreign manufacturer owned the U.S. trademark because "a mere importer and distributor acquires no rights in the marks used on the imported goods by the foreign exporter in the absence of an assignment of any kind"); *Spencer v. VDO Instruments, Ltd.*, 352 F.2d 784, 785–86 (6th Cir. 1965) (holding that plaintiff with exclusive sales right in the United States was never the owner of the trademark to that product); *Tactica Int'l v. Atlantic Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 600 (S.D.N.Y. 2001) ("As a general rule, when a manufacturer and exclusive distributor contest the ownership of a trademark and no agreement controls, it is the manufacturer who presumptively owns the mark."); *see also* 2 McCarthy on Trademarks § 16:49 (4th ed.); 5 McCarthy on Trademarks § 29:8 (4th ed.).

[14] Again, PSI's failure to serve the individuals who made these purchases in 2003 does not contradict that the sales occurred. *See supra* note 6.

PSI seeks to avoid this conclusion by arguing that Nahshin's direct sales in the United States were too sporadic and insubstantial to establish trademark rights. PSI's focus on these individual sales is a doomed attempt to avoid the elephant in the room, namely, Nahshin's substantial sales of his NIC OUT marked filters to SAS *and PSI* over a five to six year period. In response, PSI contends that these sales do not constitute market use by *Nahshin* because, as PSI claims, "Nahshin explicitly endorsed SAS as the face of the brand from 2003–2006" by placing SAS's name, phone number, and a URL—"www.nicout.com"—controlled by SAS on the NIC OUT packaging. In effect, PSI argues that SAS's distribution of NIC OUT filters constituted market activity in favor of *SAS*'s ownership of the mark, not Nahshin's ownership, which ownership was then transferred to PSI in an alleged oral agreement with SAS when the companies parted ways in 2007. Although PSI could theoretically have obtained the mark via this alleged oral agreement if SAS had owned the trademark at the time, the record shows the contrary, namely that SAS *did not* own the trademark then or ever.[15] PSI can point to nothing in the summary judgment record showing an agreement that the trademark rights established by SAS's sales of NIC OUT within the United States would inure to the benefit of SAS rather than Nahshin. Indeed, Nahshin testified in his deposition that the relationship between him and SAS/Maslov was one of "buyer and seller." Nahshin Depo. at 58. Given the absence of evidence of any agreement between P. Service and SAS, oral or otherwise, pertaining to ownership of the NIC OUT mark, there is no basis to rebut the presumption that the trademark rights would accrue to Nahshin, the foreign manufacturer, over SAS, the domestic distributor. *See Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1220 (9th Cir. 1996); *see also* 5 McCarthy on Trademarks

---

[15] Moreover, PSI's *belief* that SAS was the owner of the NIC OUT trademark and thus capable of conveying ownership is irrelevant; PSI's belief does not control common law ownership of the mark.

§ 29:8. In fact, an early e-mail message from Maslov to a P. Service employee supports Nahshin's characterization of his relationship with SAS. In that message, Maslov wrote that he planned to exhibit NIC OUT at a trade show in New York and requested that P. Service send him "any advertising brochures or maybe flyers" in order to "help me to arrange my pavilion." Pltf.'s Ex. B. In other words, Maslov in essence acknowledged that Nahshin remained in control of branding NIC OUT in the United States. Thus, even assuming *arguendo* that SAS did agree to transfer the NIC OUT trademark to PSI upon the dissolution of their business relationship, SAS had nothing to transfer;[16] the common law ownership of the mark remained with Nahshin.

Next, PSI argues that its sales of Nahshin's NIC OUT marked filters within the United States cannot be credited to Nahshin because the usual presumption in favor of the manufacturer in a trademark ownership dispute with an exclusive domestic distributor is rebutted here. In this regard, courts consider the following factors in determining whether the manufacturer or the distributor has the superior right of ownership, including:

(1)     which party invented and first affixed the mark onto the product;

(2)     which party's name appeared with the trademark;

(3)     which party maintained the quality and uniformity of the product; and

(4)     with which party the public identified the product and to whom purchasers made complaints.

---

[16] It is also worth noting that, in addition to SAS having nothing to transfer, PSI filed its intent to use application in March 2006, months *before* the alleged 2007 oral agreement with SAS that PSI would "keep" the NIC OUT mark.

*Sengoku Works, Ltd.*, 96 F.3d at 1220.[17] Nahshin argues that this framework is inapplicable because PSI was never the "exclusive" distributor of NIC OUT in the United States, given the absence of an explicit exclusivity agreement and that Nahshin himself made individual direct sales to customers in the United States. Assuming without deciding that the *Sengoku* framework applies in this case to attempt to rebut the normal presumption that the foreign manufacturer prevails over an exclusive distributor with respect to ownership of a trademark, the weight of those factors in this case still favors Nahshin's ownership of the trademark.

The first factor—which party invented and first affixed the mark onto the product—weighs in favor of Nahshin. The evidence on this record shows that Nahshin first developed the NIC OUT mark with the help of his English-speaking wife in 1999. Further, the undisputed facts show that Nahshin worked with his Turkish manufacturer to affix the NIC OUT brand to the filters in 2000. Although PSI argues that an unrelated individual, Henry Hsu, registered the trademark "NICOUT" for a somewhat different cigarette product—a registration that has since been cancelled—the undisputed facts show that Nahshin independently arrived at the mark NIC OUT for his mechanical cigarette filters and then sold those NIC OUT branded filters in the United States through his relationship with SAS and Maslov and then through PSI. Thus, the first factor weighs against rebutting the presumption that Nahshin owned the mark.

The second factor—which party's name appeared with the trademark—also weighs against rebutting the presumption in favor of Nahshin. Although the record reflects that neither Nahshin's name nor that of his company, P. Service, appeared on most if not all of the NIC OUT

---

[17] *See also Hill Holliday Connors Cosmopulos, Inc. v. Greenfield*, 433 F. App'x 207, 829 (4th Cir. 1997); *Tecnimed SRL v. Kidz-Med, Inc.*, 462 F. App'x 31, 33 (2d Cir. 2012); 5 McCarthy on Trademarks § 29:8.

packaging sold by SAS and PSI within the United States from 2003 to 2007,[18] the filters sold by SAS and PSI bore *SAS*'s name and contact information, not PSI's. Further, PSI's name only appeared on the NIC OUT packaging starting in 2007, when PSI began purchasing NIC OUT directly from Nahshin. Thus, the second factor does not weigh in favor of PSI's ownership of the mark.

The weight of the third factor—which party maintained the quality and uniformity of the product—is inconclusive. PSI contends that during its relationship with SAS, PSI handled complaints from consumers when packages "did not include the necessary insert or if the packages did not include 30 filters but were short," and directed SAS to address the issues. Higgins Decl. ¶ 18.[19] But there is no evidence in the record besides a single statement in Higgins' declaration to support this, and nothing in the record describes the content of these consumer interactions. Further, the complaints described address the fulfillment of orders, not

---

[18] The record does not disclose whether the NIC OUT filters Nahshin sold directly to individual consumers in the United States bore the P. Service name. It is undisputed that Nahshin changed the NIC OUT packaging to remove P. Service and replace it with "IMPORTER: Safety Aid Supplies, Inc." at least with respect to the filters sold to SAS before the New York City trade show at which Maslov met Higgins. Higgins contends that the NIC OUT filters on display at this trade show did not bear Nahshin's or P. Service's name.

[19] PSI also points to evidence that (i) PSI asked P. Service to fix problems with product packaging, such as a window that was off center. Higgins Decl. ¶¶ 22–26; Ex. H; and that (ii) when a wholesale customer contacted P. Service with a question about NIC OUT in February of 2008, P. Service directed that customer to PSI. *See* Pltf.'s Ex. H ("Dear Sir, For every question about distribution and purchasing of Nic-Out filters, please contact our American distributor by the following address."). In addition, the final agreement between PSI and SAS, dated November 1, 2007 stated that PSI was responsible for "quality control and complaints." But the relevant time period for determining trademark ownership is *prior* to that time, specifically the three years that Nahshin was selling to SAS which, in turn, was selling Nahshin's NIC OUT marked filters to PSI. It is the first NIC OUT sales activity—and whether at that time the brand name was more closely associated with Nahshin and P. Service or PSI—that determines which party was truly the bona fide user in the ordinary course of trade. In this regard, the summary judgment record as a whole points persuasively in favor of Nahshin.

the quality or design of the product itself. Moreover, the record shows that Nahshin communicated with the Turkish manufacturers of NIC OUT in order to make design changes to the actual product. *See* Nahshin Depo. at 41–42.[20] Thus, the third factor is essentially in equipoise and does not weigh in favor of PSI.

Finally, the fourth factor—which party the public identified with the product—is also neutral. On the one hand, PSI asserts that it fielded customer inquiries and complaints about NIC OUT and, pursuant to PSI's final agreement with SAS, took over control of the www.nicout.com URL in 2007. Higgins Decl. ¶ 18. On the other, Nahshin maintained another website beginning in 2005, www.nic-out.com, which allowed consumers to purchase NIC OUT filters directly and provided information about the product and stated that "Our Company (P.Service) is the exclusive proprietor of NIC-OUT cigarette filters." Pltf.'s Ex. J. Thus, the fourth factor does not strongly favor either Nahshin or PSI.

On balance, therefore, the *Sengoku* factors do not support rebutting the presumption in favor of Nahshin's common law ownership of the NIC OUT mark. In summary, therefore, a review of the record points convincingly to the conclusion that Nahshin is the common law owner of the NIC OUT mark and that PSI is not entitled to reinstatement of its registration of the NIC OUT mark.

This does not end the analysis, however, because PSI asserts the affirmative defense of acquiescence, arguing that Nahshin impliedly consented to PSI's use and ownership of the NIC

---

[20] In its opposition to Nahshin's motion for summary judgment, PSI attempts to dispute the fact that Nahshin made design changes to the cigarette filters but its citation to record evidence—Nahshin's Deposition at 41:5–42:12—actually *supports* rather than refutes Nahshin's contention that he made design changes and responded to problems with the product design. Although Nahshin testified at one point that he did not make any design changes to the filter he initially procured from Burda Ticaret, it appears that he later did have design input when he shifted his business from Burda Ticaret to Atash. *See* Nahshin Depo. at 27–30.

OUT mark, and thus that Nahshin should be barred from now seeking cancellation. The Lanham Act explicitly incorporates the equitable principle of estoppel by acquiescence in 15 U.S.C. § 1115(b)(9).[21] Acquiescence is a type of estoppel or laches involving affirmative conduct that "expressly or by clear implication" indicates a party's consent to another's infringing use. *See Christian Broad. Network, Inc. v. ABS-CBN Int'l*, 84 U.S.P.Q.2d 1560, at *16 (T.T.A.B. 2007) ("A plaintiff will not be permitted to stop conduct that it fostered or tolerated, where the result would be prejudicial to the defendant."). Although commonly an affirmative defense in an infringement action,[22] the TTAB has held that acquiescence may bar cancellation claims. *See, e.g., id.; Land O'Lakes, Inc. v. Land O'Frost, Inc.*, 224 U.S.P.Q. 1022, at *9 (T.T.A.B. 1984).

Importantly, however, acquiescence may not bar cancellation claims where the likelihood of confusion is highly likely or *inevitable*. Put differently, "a strong showing of a likelihood of confusion can trump even a proven case of acquiescence by the senior user to the junior user's usage." 6 McCarthy on Trademarks § 31:41 (4th ed.); *see also Sara Lee Corp.*, 81 F.3d at 461; *Christian Broad. Network, Inc.*, 84 U.S.P.Q.2d at *16. In other words, where, as here, there is a strong likelihood of confusion because two parties claim ownership of the exact same mark identifying the exact same product, acquiescence cannot bar a cancellation claim. This is so because the public interest in avoiding confusion in the marketplace must trump any inequity to the party relying on another's acquiescence. *See Sara Lee Corp.*, 81 F.3d at 461 ("[I]n consideration of the public interest, estoppel by laches may not be invoked to deny injunctive

---

[21] The Lanham Act provides that "evidence of the right to use the registered mark shall be subject to proof of infringement . . . and shall be subject to . . . defenses or defects" including "equitable principles, including laches, estoppel, and acquiescence." 15 U.S.C. § 1115(b).

[22] *See, e.g., Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996) (infringement action may be barred by the doctrine of estoppel by acquiescence where the owner of the trademark "expressly or impliedly consents to the infringement" by conveying such consent to the alleged infringer "through affirmative word or deed").

relief if it is apparent that the infringing use is likely to cause confusion."); *id.* at 463 ("[P]ublic

policy dictates that [estoppel-by-acquiescence] not be rigidly applied in cases ... where the

likelihood of confusion is apparent."). In this circuit, courts are instructed to weigh nine non-

exhaustive factors to determine the likelihood of confusion:

> (i)     the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace;
>
> (ii)     the similarity of the two marks to consumers;
>
> (iii)     the similarity of the goods or services that the marks identify;
>
> (iv)     the similarity of the facilities used by the markholders;
>
> (v)     the similarity of advertising used by the markholders;
>
> (vi)     the alleged infringer's intent;
>
> (vii)     actual confusion;
>
> (viii)     the quality of the alleged infringer's product; and
>
> (ix)     the sophistication of the consuming public.

*Swatch AG*, 739 F.3d at 158 (quoting *George & Co. LLC v. Imagination Entertainment Ltd.*, 575

F.3d 383, 393 (4th Cir. 2009)). In this case, these factors weigh conclusively in favor of a strong

and inevitable likelihood of confusion because PSI's and Nahshin's purported marks are *exactly*

*the same* and apply to *exactly the same* goods. PSI's claim to ownership of the NIC OUT mark

due to Nahshin's acquiescence therefore fails. Accordingly, PSI is not entitled to reinstatement

of its registration of the NIC OUT mark based on the equitable doctrine of acquiescence.

It is undisputed that PSI spent substantial sums in promoting, marketing, and selling NIC

OUT within the United States. And it may be that PSI made these investments in the mistaken

belief that it owned or would thereby gain trademark rights in the NIC OUT mark. Nevertheless,

the undisputed facts show that Nahshin was the common law owner of the NIC OUT mark at the time of PSI's application for registration. Accordingly, it follows that PSI's motion for summary judgment with respect to its claim for reinstatement must be denied and Nahshin's cross motion for summary judgment on this claim must be granted.

## III.

Given the conclusion that Nahshin, not PSI, was the common law owner of the NIC OUT mark at the time PSI applied for registration, it is appropriate to turn to Nahshin's counterclaim for trademark infringement. To establish his claim for trademark infringement, Nahshin must show that he possesses a protectable mark, as already concluded, and the following:

(i)     that the alleged infringer, PSI, used the mark;

(ii)    that the infringer's use of the mark occurred "in commerce";

(iii)   that the infringer used the mark "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and

(iv)    that the infringer used the mark in a manner likely to confuse consumers.

*People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001). As the parties do not dispute that these other elements of trademark infringement are met here, the remaining question on Nahshin's trademark infringement claim is whether PSI has established its entitlement to the affirmative defenses of acquiescence and laches.

Where a movant seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense. *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986)). Once the movant, in this case PSI, has produced sufficient evidence to

support its affirmative defense, the burden of production shifts to the nonmovant to "come forward with specific facts showing there is a genuine issue for trial." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 614 (4th Cir. 1999). Yet, if the movant fails to meet its initial burden of providing sufficient facts to make out its affirmative defense, "summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing." *Ray Commc'ns, Inc.*, 673 F.3d at 299 (quoting *Giannullo v. City of New York*, 322 F.3d 139, 140–41 (2d Cir. 2003)).

PSI asserts two affirmative defenses to Nahshin's trademark infringement counterclaim: (i) estoppel by laches and (ii) acquiescence. Estoppel by laches operates to deny relief to a claimant who had knowledge of the alleged infringement and who has, to the detriment of defendant, unreasonably delayed in seeking redress. *Sara Lee Corp.*, 81 F.3d at 461. The doctrine of acquiescence, as already discussed, is a similar equitable defense that bars monetary or injunctive remedies against an otherwise infringing party where the trademark owner has affirmatively conveyed his implied consent to the infringement. Although acquiescence and laches are similar doctrines, the Fourth Circuit recognizes that acquiescence requires some active consent, whereas laches implies merely passive consent. *Id.*; *see also What-A-Burger of Va., Inc. v. Whataburger, Inc.*, 357 F.3d 441, 502 (4th Cir. 2004) (noting that while both acquiescence and laches "connote consent by the owner to an infringing use of his mark . . . acquiescence implies active consent"); *see also* 6 McCarthy on Trademarks § 31:41. Finally, although estoppel by laches and acquiescence may not be invoked to deny *injunctive* relief where the likelihood of confusion is inevitable, they may still be effective to bar a claim for damages. *See Sara Lee Corp.*, 81 F.3d at 463. Thus, given that the competing NIC OUT marks and products in dispute here are exactly the same, *see supra* Part II, analysis of PSI's laches and acquiescence defenses

will proceed only as to whether these defenses prevent Nahshin from collecting retrospective, monetary damages.

Under the doctrine of acquiescence, "[a]n infringement action may be barred . . . where the owner of the trademark, by conveying to the defendant through affirmative word or deed, expressly or impliedly consents to the infringement." *Sara Lee Corp.*, 81 F.3d at 462. Acquiescence assumes a "preexisting infringement" that "requires that the trademark owner knowingly consent—albeit actively—to the defendant's infringing use of the mark." *Id.* at 463. Thus, to succeed in its acquiescence defense, PSI must establish that Nahshin conveyed by *affirmative word or deed* that he expressly or impliedly *consented* to PSI's *infringing* use of the NIC OUT mark.

It is useful first to determine at what point PSI's use of the NIC OUT mark became *infringing. See id.* at 463 ("holding that "a preexisting infringement is a prerequisite" to an acquiescence defense because the trademark owner must "knowingly consent . . . to the defendant's infringing *use* of the mark"). Although PSI applied to register the NIC OUT mark for its own benefit on March 21, 2006, PSI only began selling products labeled NIC OUT that did not originate with Nahshin and P. Service at the end of 2007 or the beginning of 2008. *See* Higgins Decl. ¶ 21 (stating that PSI purchased NIC OUT from Nahshin through November 2007). On the one hand, then, PSI's infringing use of the NIC OUT mark only began in 2008 when it first sold goods under the NIC OUT name without going through the P. Service supply chain. On the other hand, PSI's application for and registration of the NIC OUT mark in March 2006 for the precise product that Nahshin was selling was clearly an act adverse to Nahshin's rights in the mark. Therefore, while not strictly infringing, March 21, 2006 is appropriately

considered the point at which PSI's actions with respect to the NIC OUT mark became adverse to Nahshin's rights.

It must next be determined whether Nahshin conveyed by affirmative word or deed that he impliedly or expressly consented to PSI's adverse use of the NIC OUT mark. PSI contends that Nahshin knew of PSI's claim to the NIC OUT mark no later than May 2007 when P. Service agreed to place PSI's name and trademark application number on the NIC OUT packaging. Nahshin's approval of this packaging change demonstrates that he knew of PSI's trademark application and thus that he knew PSI claimed trademark rights adverse to his own.[23] Indeed, Nahshin has stipulated that he knew that PSI had filed a trademark application prior to PSI's receipt of the registration in December 2007. Stip. of Uncontested Facts ¶ 8. Besides allowing PSI to place its name and trademark application number on the NIC OUT packaging, Nahshin failed to object to a May 19, 2008 email in which Higgins wrote that, "My company [PSI] is the SOLE OWNER of the Nic Out Trademark" in the United States. Pltf.'s Ex. H. In fact, a P. Service employee responded to this clear claim of ownership by demurring and affirming PSI's statement, writing: "I am glad to realize that finally there is a company, which is able to take care of Nic-Out product in whole [sic] USA territory. Please inform me about all your steps related to our common business." Pltf.'s Ex. H (May 20, 2008, email from "info@nic-out.com" to Gene Higgins). Finally, in May 2007 Nahshin wrote in a draft email that he had "known for over 2.5 years of [PSI's] work on our filters" and "did not contest the priority to the trade mark 'Nic-Out' even though we have grounds." Pltf.'s Ex. E (May 23, 2007, draft email). Although this email was not sent and thus cannot itself constitute an affirmative word or deed conveying Nahshin's

---

[23] PSI points out that because Nahshin had previously applied for registration of the NIC OUT mark—an application which was denied at the time—he would know the import of PSI's trademark application number. *See* Ex. V at 8 (2003 trademark application).

consent to PSI's use of the mark, it supports the inference that Nahshin's subsequent approval of PSI's packaging changes and failure to object to the "SOLE OWNER" email were in acquiescence to PSI's claim to the NIC OUT mark.

Finally, in some circuits, namely, the Second, Ninth, and Eleventh, a party asserting acquiescence as an affirmative defense must also show that the acquiescence of the trademark owner caused the alleged infringer undue prejudice. *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 989 (9th Cir. 2010); *ProFitness Physical Therapy Center v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002); *SunAmerica Corp. v. Sun Life Assurance Co. of Can.*, 77 F.3d 1325 (11th Cir. 1996). Although the Fourth Circuit in its earliest acquiescence case, *Ambrosia Chocolate Co. v. Ambrosia Cake Bakery*, 165 F.2d 693, 697 (4th Cir. 1947), concluded that estoppel by acquiescence applied to avoid "a manifest commercial injustice," the Fourth Circuit has not yet spoken on the necessity of showing prejudice as an element of an acquiescence defense. Assuming that prejudice is required, PSI is able to meet this requirement by showing economic prejudice. Specifically, the summary judgment record shows that PSI made substantial investments in marketing NIC OUT through television ads, trade shows, and free shipping promotions since 2007. Higgins Decl. ¶ 29; *see Ray Commc'ns, Inc.*, 673 F.3d at 305 ("A defendant suffers economic prejudice when it relies on the trademark owner's inaction by developing a valuable business around the trademark."); *Bridgestone/Firestone Research, Inc. v. Auto. Club De L'Quest De La France*, 245 F.3d 1359, 1363 (Fed. Cir. 2001) ("Economic prejudice arises from investment in and development of the trademark, and the continued commercial use and economic promotion of a mark over a prolonged period adds weight to the evidence of prejudice."). Thus, PSI has shown economic prejudice that goes beyond the mere inconvenience of losing a mark it has used for a

number of years; PSI's investments, misguided as they were, have created the market for NIC OUT within the United States, and it would be inequitable to allow Nahshin now to collect damages given his conduct in the course of his business relationship with PSI.

Thus, because the undisputed record shows that Nahshin failed to take prompt action to disabuse PSI of the notion that PSI was entitled to register and use the NIC OUT mark as its own and indeed affirmatively took action in support of this misconception, PSI has successfully demonstrated that acquiescence bars Nahshin's claim for trademark infringement damages. Given this conclusion, it is unnecessary to reach or decide whether PSI's affirmative defense of laches applies in this case.

## IV.

For the foregoing reasons, Nahshin's motion for summary judgment as to PSI's claim for reinstatement of its registration of the NIC OUT mark must be granted and PSI's motion for summary judgment on this claim must be denied. Furthermore, because PSI has established that Nahshin acquiesced to PSI's registration and use of the mark, PSI's motion for summary judgment as to Nahshin's infringement counterclaim (Count I) must be granted with respect to Nahshin's claim for damages but denied with respect to Nahshin's request for future injunctive relief. Nahshin's remaining counterclaims, both of which assert grounds for cancellation of PSI's NIC OUT registration, must be denied as moot. The issue of framing an appropriate injunctive remedy against future infringement by PSI remains to be resolved.

An appropriate Order will issue.

Alexandria, Virginia
June 24, 2015

/s/
T. S. Ellis, III
United States District Judge